IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

————————————————————————

MUHAMMAD SHABAZZ, formerly known as
DWAYNE STOREY,

                                     Plaintiff,

            v.                                           Civil Action No.
                                                        9:02-CV-760 (FJS/DEP)


JOSEPH COSTELLO, Superintendent of
Mid-State Correctional Facility, *et al.*,

                                     Defendants.

————————————————————————

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

MUHAMMAD SHABAZZ, *Pro Se*

FOR DEFENDANTS:

HON. ELIOT SPITZER              MEGAN M. BROWN, ESQ.
Attorney General of the          Assistant Attorney General
State of New York
The Capitol
Albany, New York  12224


DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

Plaintiff Muhammad Shabazz, a New York State prison inmate

formerly known as Dwayne Storey, has commenced this action against

the superintendent and two medical professionals working at the prison

facility in which he was housed at the time his complaint was filed,

alleging constitutional violations arising out of their conduct.  In his

complaint, plaintiff maintains that defendants confiscated a knee brace

which he possessed at the time of his transfer into the prison facility

without affording him a hearing, in violation of his due process rights as

guaranteed by the Fourteenth Amendment, and that by their seven month

delay in providing him with a substitute knee brace the defendants were

deliberately indifferent to his serious medical needs, in derogation of his

Eighth and Fourteenth Amendment rights.

Currently pending before the court is an unopposed motion by the

defendants seeking the entry of summary judgment dismissing plaintiff's

complaint on a variety of bases including, *inter alia*, plaintiff's failure to

offer evidence to support his contention that he suffered from a serious

medical need, and the lack of evidence of defendants' personal

involvement in the due process violations alleged.  For the reasons set

forth below, I recommend that defendants' motion be granted.

I.      BACKGROUND

At the times relevant to his claims, plaintiff was a New York State

2

prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS").  Plaintiff was transferred from the Mid-Orange Correctional Facility ("Mid-Orange") into the Mid-State Correctional Facility ("Mid-State"), located in Marcy, New York, on January 31, 2001.  Complaint (Dkt. No. 1) ¶ 6; Baxter Decl. (Dkt. No. 21) ¶ 12. Plaintiff alleges that the time of his transfer, he possessed a knee brace which had been issued to him by medical staff at the Walkill Correctional Facility to address osteoarthritis in his right knee, stemming from a prior fractured femur and right knee injury suffered during an automobile accident in 1991.[1]  Complaint (Dkt. No. 1) ¶ 6; Baxter Decl. (Dkt. No. 21) ¶ 15; Ramineni Decl. (Dkt. No. 21) ¶ 7.  According to Shabazz, however, upon his arrival at Mid-State that knee brace was confiscated, a fact he attributes to security concerns over allowing him to possess an implement which includes, as components, metal pieces which could be fashioned into weapons.  Complaint (Dkt. No. 1) ¶ 6.

---

[1]      Although denying any involvement in the alleged confiscation of plaintiff's knee brace defendants assert, based upon plaintiff's medical records, that there is no indication plaintiff was in fact issued a knee brace prior to his transfer into Mid-State. *See, e.g.*, Baxter Decl. (Dkt. No. 21) ¶ 13; Ramineni Decl. (Dkt. No. 21) ¶ 9.  While this discrepancy creates an issue of fact which cannot properly be resolved on motion for summary judgment, as will be seen the fact dispute is not material, and does not serve as an impediment to the dismissal of plaintiff's claims as a matter of law.

Following his arrival at Mid-State, plaintiff appeared at sick call on February 5, 2001; at that time he was scheduled to see a prison doctor for purposes of evaluating his right knee condition. Baxter Decl. (Dkt. No. 21) ¶¶ 14-15, Exh. A at 93. Shabazz was subsequently seen by Dr. Subbarao Ramineni, a DOCS physician employed at Mid-State, on February 13, 2001. *Id.* ¶ 15, Exh. A at 92, 261; Ramineni Decl. (Dkt. No. 21) ¶ 7. As a result of that visit plaintiff was issued a permission slip authorizing his permanent assignment to a bottom bunk, and was provided with a one piece elastic knee brace similar to an Ace bandage. Baxter Decl. (Dkt. No. 21) ¶ 15, Exh. A at 92, 261; Ramineni Decl. (Dkt. No. 21) ¶ 7. In addition, following that visit a referral was made to have the plaintiff seen by an orthopedic consultant. *Id.*

On May 8, 2001 Shabazz was examined by an orthopedic specialist, Dr. Makhuli, at the Walsh Regional Medical Unit, located within the Mohawk Correctional Facility.[2] Baxter Decl. (Dkt. No. 21) ¶¶ 18-19, Exh. A at 150, 330. Based upon that consultative visit, plaintiff was referred for physical therapy, and was subsequently seen by a therapist on June 25,

---

[2]     As an explanation for the delay in scheduling the orthopedic consultation defendants cite logistical considerations, including the need to group a certain number of inmates designated for orthopedic consultation together before arranging for the visit. Baxter Decl. (Dkt. No. 21) ¶¶ 20-21.

2001.  Baxter Decl. (Dkt. No. 21) ¶ 22, Exh. A at 149, 330.  Following that

initial visit, however, the assigned physical therapist, Teurai Mutanga,

opted not to recommend any follow-up therapy for the plaintiff, concluding

that no amount of physical therapy would assist him based upon "a poor

potential for restorative care".  *Id.* ¶ 23, Exh. A at149.

On July 5, 2001 plaintiff was again seen by Dr. Ramineni, who noted

in plaintiff's medical records a reported recommendation from the

orthopedic specialist that plaintiff be provided with a hinged knee brace.

Baxter Decl. (Dkt. No. 21) ¶ 25, Exh. A at 87; Ramineni Decl. (Dkt. No.

21) ¶ 11.  While not agreeing that a hinged knee brace was medically

necessary, based upon plaintiff's condition, Dr. Ramineni instructed

defendant Baxter, the Nurse Administrator at Mid-State, to explore

arrangements to obtain such a device for Shabazz.  Ramineni Decl. (Dkt.

No. 21) ¶¶ 12-15.

In accordance with Dr. Ramineni's directive, Nurse Administrator

Baxter began the process required for obtaining a hinged knee brace

which would be compliant with applicable prison security requirements,

including that the brace not contain any metal parts located on the outside

and thus accessible to the plaintiff and other inmates.  Baxter Decl. (Dkt.

5

No. 21) ¶ 25.  Those efforts entailed working with a managed care company with which the DOCS deals to arrange for the provision of such medical necessities for inmates.[3,4]  Part of the difficulty in securing a brace resulted from the need to find one which was made either without metal, or with metal securely fastened on the inside rather than exposed and available to be fashioned into a weapon.  Baxter Decl. (Dkt. No. 21) ¶ 25.

As a result of Nurse Administrator Baxter's efforts, an unhinged neoprene brace was provided to the plaintiff on April 2, 2002, on a trial basis.  Ramineni Decl. (Dkt. No. 21) ¶ 22; Baxter Decl. (Dkt. No. 21) Exh. A at 65.  A hinged metal brace which did not have metal on the outside, but instead contained metal sewn into place within the brace, was ultimately approved by both security personnel at Mid-State and the managed care company, and was issued to the plaintiff on May 23, 2002.[5]

---

[3]     Although efforts to obtain a hinged knee brace for the plaintiff may have been initiated during his stay at other facilities, as Nurse Administrator Baxter explains, she was nonetheless required to begin those efforts anew since Mid-State and the place of plaintiff's prior incarceration, the Mid-Orange Correctional Facility, were in different "hubs" for the purpose of dealing with outside orthotics providers.  Baxter Decl. (Dkt. No. 21) ¶ 13.

[4]     A managed care company, described as being similar to a health maintenance organization ("HMO"), has been retained to handle all medical claims for the DOCS.  Baxter Decl. (Dkt. No. 21) ¶ 10.

[5]     The delay occasioned in providing the requested knee brace occurred as a result of a variety of circumstances, including an apparent error made by the managed care company in processing information regarding approval for the hinged

During the interval between Ramineni's approval for a hinged knee brace

and the time that it was provided, plaintiff was seen by health care

providers on a regular basis and was provided with an elastic knee brace

on November 27, 2001.  Baxter Decl. (Dkt. No. 21) ¶¶ 24-33, Exh. A at

67.

II.   PROCEDURAL HISTORY

        Plaintiff commenced this action on June 10, 2002.[6]  Dkt. No. 1.

Named as defendants in plaintiff's complaint are Mid-State

Superintendent Joseph Costello, as well as Dr. Ramineni and Sally

Baxter, a physician and the nurse administrator, respectively, at Mid-

State.  *Id.*  Plaintiff's complaint asserts six separate causes of action,

_____

knee brace.  *See* Baxter Decl. (Dkt. No. 21) ¶ 31.

        [6]        In his complaint, plaintiff listed his place of confinement as Mid-State.  A
routine check of the DOCS inmate locator service conducted by my staff has revealed
that the plaintiff is now incarcerated within the Five Points Correctional Facility.
Plaintiff's failure to notify the court and defendants' counsel of his change of address
represents a violation of this court's local rules, and provides an independent basis for
dismissal of plaintiff's complaint.  *See* Northern District of New York Local Rule
10.1(b)(2).  While I have chosen not to recommend dismissal of plaintiff's complaint on
this procedural basis, particularly in view of my recommendation on the merits, plaintiff
is reminded that in the future he must apprise the court, in this and any other actions
filed by him, of his whereabouts for the sake of facilitating communications with him by
the court and any adversaries.  I note that notwithstanding two apparent address
changes on the part of the plaintiff since the filing of defendants' motion, a review of
the docket sheet does not reflect the return of any mail sent by the court, and thus
there is no reason for the court to believe that the plaintiff is unaware of the pendency
of this motion.

including 1) a claim against defendant Costello based upon the failure to provide the requested knee brace, asserting violations of the Eighth and Fourteenth Amendments to the United States Constitution as well as the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; 2) a claim against defendant Costello for violation of plaintiff's procedural due process rights, associated with the alleged confiscation of plaintiff's previously issued knee brace; and 3) claims against defendants Dr. Ramineni and Nurse Baxter, paralleling plaintiff's first two causes of action against defendant Costello.

Following the joinder of issue by the filing of an answer on October 17, 2002 on behalf of the defendants, Dkt. No. 11, and pretrial discovery, which included the taking of plaintiff's deposition pursuant to court ordered authorization, Dkt. No. 15, defendants moved on June 25, 2004 for summary judgment.  Dkt. No. 21.  Despite the passage of the deadline for doing so, plaintiff has proffered no papers in opposition to defendants' motion, which has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

    A.   Consequences Of Plaintiff's Failure To Oppose Defendants'
        Motion

Before turning to the merits of defendants' motion, I will first address

the legal significance of plaintiff's failure to properly oppose that motion.

Local Rule 7.1(b)(3) provides that

> [w]here a properly filed motion is unopposed and the Court
> determines that the moving party has met its burden to
> demonstrate entitlement to the relief requested therein, the
> non-moving party's failure to file or serve
> any papers as required by this Rule shall be deemed as
> consent to the granting or denial of the motion, as the case
> may be, unless good cause is shown.

N.D.N.Y.L.R.7.1(b)(3).  Even while recognizing that *pro se* plaintiffs are

entitled to special latitude when defending against summary judgment

motions *(see Jemzura v. Public Serv. Comm'n*, 961 F. Supp. 406, 415

(N.D.N.Y. 1997) (McAvoy, C.J.)), courts in this district have found it

appropriate to grant a dispositive motion pursuant to Local Rule 7.1(b)(3)

based upon a *pro se* plaintiff's failure to respond.  *Robinson v. Delgado*,

96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J.

and Hurd, M.J.); *Cotto v. Senkowski*, 95-CV-1733, 1997 WL 665551, at *1

(N.D.N.Y. Oct. 23, 1997) (Pooler, J. and Hurd, M.J.); *Wilmer v. Torian*,

980 F.Supp. 106, 106-07 (N.D.N.Y. 1997) (Pooler, J. and Hurd, M.J.).  As

can be seen by the face of the rule, however, before summary judgment can be granted – even in the absence of opposition – the court must review the motion to determine whether it is facially meritorious.  *See Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 231-32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp.2d 542, 545-46 (N.D.N.Y. 2000) (Kahn, J.).

In making its review for facial sufficiency of defendants' motion, the court may properly accept as true the assertions in defendants' motion papers and, in particular, their statement pursuant to Local Rule 7.1(a)(3), in light of plaintiff's failure to submit a response to that statement.[7]  Courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond.  *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

---

[7]    According to Local Rule 7.1(a)(3), "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."  *See* N.D.N.Y.L.R. 7.1(a)(3) (emphasis omitted).

In light of the foregoing, and notwithstanding plaintiff's failure to oppose the relief now sought, it is necessary to examine the facial sufficiency of defendants' motion, applying the now familiar summary judgment standard.  That analysis, however, will be undertaken taking into account the facts set forth in Defendants' Local Rule 7.1(a)(3) Statement, each of which is deemed admitted by virtue of plaintiff's failure to properly oppose defendants' motion.

B.   Summary Judgment Standard

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).

When summary judgment is sought, the moving party bears an initial

11

burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n. 4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.[8]  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); *see also Anderson*, 477 U.S. at 250, 106

---

[8]      A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than merely "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict.").

### C.   Plaintiff's Deliberate Indifference Claims

In his first, third, and fifth causes of action, Shabazz complains of the deliberate indifference to his medical needs exhibited by defendants' confiscation of his knee brace and the delay in providing him with a replacement, following his transfer into Mid-State.  Plaintiff maintains that defendants' actions ran afoul of the Eighth Amendment's prohibition against cruel and unusual punishment, as well as relevant provisions of the ADA and section 504 of the Rehabilitation Act.

### 1.   Eighth Amendment

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are "incompatible with the evolving standards of decency that mark the progress of a maturing society."[9] *Estelle v. Gamble*, 429 U.S. 97, 102-03, 97 S.Ct. 285, 290 (1976) (citations and internal quotations omitted); *see also Whitley v. Albers*, 475

---

[9]      That amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.

U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986) (citing, *inter alia*, *Estelle*).

The Eighth Amendment "'does not mandate comfortable prisons'", but does not tolerate inhumane ones either; thus the conditions of an inmate's confinement, including medical care, are subject to Eighth Amendment scrutiny. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).  To succeed on a claim alleging that prison conditions, including but not limited to medical care, violate the Eighth Amendment, a plaintiff must satisfy both an objective and a subjective requirement – the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference".  *Farmer*, 511 U.S. at 834, 114 S. Ct. at 1977 (citations and internal quotations omitted); *see also Leach v. Dufrain*, 103 F. Supp.2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321 (1991)); *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (also citing, *inter alia*, *Wilson* ).

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need

which is, in objective terms, "'sufficiently serious'".  *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citing *Wilson*, 501 U.S. at 298, 111 S. Ct. at 2324), *cert. denied sub nom.*, *Foote v. Hathaway*, 513 U.S. 1154, 115 S. Ct. 1108 (1995).  A medical need is serious for constitutional purposes if it presents "'a condition of urgency' that may result in 'degeneration' or 'extreme pain'."  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citations omitted).  A serious medical need can also exist where "'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'" – since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts.  *Harrison v. Barkley*, 219 F.3d 132, 136-37 (2d Cir. 2000) (quoting, *inter alia*, *Chance*).  Relevant factors in making this determination include injury that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'chronic and substantial pain.'"  *Chance*, 43 F.3d at 701 (citation omitted).

Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979; *Leach*, 103 F. Supp.2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).

It is well established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105-06, 97 S. Ct. at 201-02; *Chance*, 143 F.3d at 703; *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir.), *cert. denied*, 506 U.S. 1040, 113 S. Ct. 828 (1992). Diagnostic techniques and treatments are a "classic example of a matter for medical judgment", and medical staff is vested with broad discretion to determine what method of diagnosis and/or treatment to provide its patients. *Estelle*, 429 U.S. at 107, 97 S. Ct. at 293; *Chance*, 143 F.3d at 703; *Rosales v. Coughlin*, 10 F. Supp.2d 261, 264 (W.D.N.Y. 1998).

In their motion, defendants argue that the record fails to contain evidence from which a reasonable factfinder could conclude that plaintiff's

knee condition represented a serious medical need.[10]  In support of that
claim they point to the opinions of Dr. Ramineni, who has noted based
upon his examinations that plaintiff did not suffer any worsening of his
condition, including increased muscle atrophy, as a result of not having
the hinged knee brace.  Ramineni Decl. (Dkt. No. 21) ¶¶ 13, 24.  Indeed,
Dr. Ramineni has characterized the brace "as a convenience to
[Shabazz], not because his knee was deteriorating in any way", adding
that the brace was not "restorative in any manner."  *Id.* ¶ 24.  Defendants
also note that plaintiff does not allege, nor does it appear from his medical
records, that plaintiff's knee condition caused him pain; this conclusion is
buttressed by the fact that plaintiff's medical records do not reflect any
request for pain medication to address his knee condition.  Baxter Decl.
(Dkt. No. 21) ¶ 40;  *see also* Defendants' 7.1(a)(3) Statement (Dkt. No.
21) ¶ 33.

I have carefully reviewed the record now before the court, and can
find no evidence to suggest that plaintiff's knee condition presented a

---

[10]     Defendants' motion focuses exclusively on the serious medical need
element of plaintiff's Eighth Amendment claims, and does not address the question of
indifference.  Although the record is strongly suggestive of a finding that defendants
were not deliberately indifferent to any of plaintiff's medical needs, I have therefore not
relied upon this as a basis for my recommendation that those claims be dismissed.

question of urgency resulting in degeneration or extreme pain.

Accordingly, plaintiff has failed to establish the existence of a

constitutionally cognizable serious medical need.  *E.g.*, *Taylor v. Kurtz*,

No. 00-CV-700, 2004 WL 2414847, at *3-*4 (N.D.N.Y. Oct. 28, 2004)

(collecting cases holding that knee injury was not a serious medical need

and finding likewise).  I therefore recommend dismissal of plaintiff's Eighth

Amendment claims on this basis.

2.     ADA And Section 504 Of The Rehabilitation Act

_____In their motion defendants also request dismissal of plaintiff's ADA

and section 504 claims.  In support of that request, defendants argue that

regardless of whether plaintiff's claims under the ADA and section 504 are

viewed as being asserted against them in their individual capacities, or

instead in their roles as state officials, those claims are legally barred.

a.     Individual Capacities

To the extent the plaintiff's claims against defendants Costello,

Ramineni and Baxter are viewed as having been brought in their individual

capacities, it is well established, as defendants argue, that neither Title II

of the ADA nor section 504 of the Rehabilitation Act provides for individual

capacity suits against state officials.  Plaintiff's first, third and fifth claims

18

against the defendants individually are therefore subject to dismissal on this basis. *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n.8 (8th Cir. 1999); *Shariff v. Coombe*, No. 96 Civ. 3001, 2002 WL 1392164, at *2 (S.D.N.Y. June 26, 2002) (citing *Garcia*).

### b.   Official Capacities

Liberally construed, plaintiff's complaint could also be regarded as alleging a violation of the ADA and the Rehabilitation Act by the defendants in their official capacities.  While defendants argue, *inter alia*, that such claims are precluded by virtue of the Eleventh Amendment, plaintiff's claims asserted against them under the ADA in their official, representative capacities are not so easily discounted.

While in *Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003), the Second Circuit held that an ADA plaintiff can assert a prospective claim for injunctive relief under *Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908), against a state official in his or her official capacity, as opposed to against the state directly, it has not explicitly held likewise for ADA plaintiffs who seek damages.  Nonetheless, as defendants argue, seeking monetary damages from DOCS officials in their official capacities, as

19

plaintiff Shabazz does in this instance, is the functional equivalent of seeking damages directly from the State of New York, and Eleventh Amendment sovereign immunity therefore ordinarily protects a defendant in his or her official capacity to the same extent that it protects the State. *See*, *e.g.*, *Garcia*, 280 F.3d at 107 (citing, *inter alia*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989)).

It is well settled under Eleventh Amendment jurisprudence that neither a state nor one of its agencies can be sued without either express or implied consent, or an express abrogation by Congress of the state's sovereign immunity.  *See*, *e.g.*, *Kilcullen v. N.Y. State Dep't of Labor*, 205 F.3d 77, 79 (2d Cir. 2000), *implicitly overruled on other grounds by Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 368, 121 S.Ct. 955, 965 (2001); *Hallett v. N.Y. State DOCS*, 109 F. Supp.2d 190, 197 (S.D.N.Y. 2000) (citations omitted).  In this respect, the Eleventh Amendment, while not directly controlling, confirms the broader, "'background principle of sovereign immunity[.]'"  *Garcia*, 280 F.3d at 107 (quoting *Seminole Tribe of Fl. v. Florida*, 517 U.S. 44, 72, 116 S. Ct. 1114, 1131 (1996)).  When abrogating sovereign immunity, Congress must both unequivocally intend to do so and act pursuant to a valid grant of

constitutional authority.  *Garrett*, 531 U.S. at 363, 121 S.Ct. at 962 (citing, *inter alia*, *Seminole Tribe*, 517 U.S. at 54, 116 S.Ct. at 1122); *Garcia*, 280 F.3d at 108 (citations omitted).  The pivotal question, in determining whether the defendants are entitled to protection under the Eleventh Amendment when sued in their official capacities, is whether, and if so to what extent, that amendment protects the states from liability under Title II of the ADA and section 504 of the Rehabilitation Act.[11]

### i.   Eleventh Amendment: ADA Claims

The question of whether the Eleventh Amendment bars ADA claims under Title II against a state is an unsettled question among the circuits.  In *Board of Trustees of University of Alabama v. Garrett*, the Supreme Court held that Congress had failed to validly abrogate state sovereign immunity under Title I of the ADA.  531 U.S. at 374, 121 S. Ct. at 967-68.  In doing so, the Court was careful to distinguish Title II from its analysis, inasmuch as the issue had not been briefed by the parties, but did note that the remedial scheme of Title II is very different from that of Title I.  *Id.* at 360 n.1, 121 S. Ct. at 960 n.1.  The courts appear to be divided as to

---

[11]     In making my analysis I have assumed, without deciding, that plaintiff's failure to include the State and/or the DOCS as a named defendant is not fatal to his claims.

whether *Garrett* should extend to Title II of the ADA, especially since

*Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 118 S.

Ct. 1952 (1998)  – which held that Title II of the ADA applies to prisons –

had been decided in the term previous to *Garrett*, but did not address

sovereign immunity.  *Compare*, *e.g.*, *Popovich v. Cuyahoga Cty. Ct. of*

*Common Pleas*, 276 F.3d 808, 813-16 (6th Cir.) (holding that sovereign

immunity validly abrogated by Congress as to the Due Process Clause),

*cert. denied*, 537 U.S. 812, 123 S. Ct. 72 (2002), with *Alsbrook*, 184 F.3d

at 1007 (finding that Congress exceeded authority by extending Title II of

the ADA to the states and therefore did not validly abrogate sovereign

immunity).

The Second Circuit has taken a slightly different approach than

various other federal courts in addressing this question.  In *Muller v.*

*Costello*, decided by the Second Circuit before the Supreme Court issued

its opinion in *Garrett*, the Second Circuit found that Congress had validly

abrogated sovereign immunity within its authority under section five of the

Fourteenth Amendment, subjecting states to potential monetary liability

under the ADA.[12]  *Muller v. Costello*, 187 F.3d 298, 311 (2d Cir. 1999).

---

[12]      That section provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article."  U.S. Const. amend XIV, § 5.

More recently, however, in *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, the Second Circuit found that *Garrett* had "implicitly abrogated" its prior position that the states were not immune from ADA claims.  280 F.3d at 113 n.3.  In *Garcia*, the Second Circuit found that Congress could not validly abrogate sovereign immunity under the Commerce Clause, one of the two empowering provisions cited in support of its enactment of Title II.  *Garcia*, 280 F.3d at 98.  The circuit court went on to find, however, that Congress could exercise its authority under section five of the Fourteenth Amendment – the "sweep of congressional authority" allowing Congress to "enforce the [F]ourteenth [A]mendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities" – when enacting Title II of the ADA, as a whole, though it found the power to have been exceeded through enactment of Title II, since that provision conferred upon Congress the right to abrogate sovereign immunity and allow for private parties to sue nonconsenting states for money damages.  280 F.3d at 108-10.  Turning to the specific question of whether Congress, through proper invocation of its section five powers, effectively abrogated sovereign immunity in the case of private damage suits under Title II, however, the Second Circuit found that the

23

ADA's broad remedial scheme, borrowed from the Rehabilitation Act and Title VI of the Civil Rights Act of 1964, included a judicially implied private cause of action, thus allowing that court latitude to shape a remedy. *Id.* at 110-12.  Specifically, the Second Circuit concluded in *Garcia* that Title II claims against the states for monetary damages could be reconciled with the prohibitions of the Eleventh Amendment if permitted in limited circumstances – in cases where a plaintiff establishes that a Title II violation was motivated by discriminatory animus or ill will based on disability.[13]  280 F.3d at 111; *see Doe v. Goord*, No. 04 CV 0570, 2004 WL 2829876, at *15 (S.D.N.Y. Dec. 10, 2004).

ii.    <u>Eleventh Amendment: Rehabilitation Act</u>

In addition to his ADA claim, plaintiff Shabazz also asserts a parallel claim under section 504 of the Rehabilitation Act against various DOCS employees "individually and in their official, representative capacities". As is the case with plaintiff's ADA cause of action, plaintiff's section 504 claims against the defendants in their individual capacities are also legally deficient.  *See*, *e.g.*, *Garcia*, 280 F.3d at 107; *Shariff*, 2002 WL 1392164, at *2.

---

[13]    The Second Circuit reaffirmed this position in *Henrietta D.*, noting that the two decisions were consistent.  331 F.3d at 268.

As to the viability of plaintiff's section 504 claims against the defendants in their official capacities, once again *Garcia* is instructive on the issue.  Before *Garrett*, the Second Circuit had extended its logic in *Muller*, in which it held that Congress had validly abrogated sovereign immunity under the ADA, to claims under section 504 of the Rehabilitation Act.  *Kilcullen*, 205 F.3d at 78.  In *Garcia*, however, the Second Circuit held that as with Title II of the ADA Congress exceeded its power under section five of the Fourteenth Amendment.  280 F.3d at 113.  Since unlike the ADA section 504 was enacted under the Constitution's Spending Clause, however, the *Garcia* court held that despite Congress's failure to properly abrogate Eleventh Amendment immunity by statute Congress could still require a state to agree to waive its sovereign immunity as a condition of accepting federal funds.  *Garcia*, 280 F.3d at 113.  While acknowledging that Congress imposed such a condition in Title 42 (42 U.S.C. § 2000d-7), the court also noted that the state's waiver, as with any waiver, must have represented an "intentional relinquishment or abandonment of a *known* right or privilege".  *Garcia*, 280 F.3d at 114 (emphasis in original) (quotation omitted).  Applying this standard, the *Garcia* court was unable to conclude that New York had knowingly waived

25

its sovereign immunity when it accepted federal funds, since at the time

when the state accepted federal funds Title II of the ADA was reasonably

understood to validly abrogate sovereign immunity under the Commerce

Clause, thereby allowing suit under the ADA and section 504 against the

state.  *Id.* (citing, *inter alia*, *Kilcullen*, 205 F.3d at 82).

Courts in this circuit have differed, however, as to what date the

State can be deemed to have understood that the DOCS acceptance of

federal funds would create potential section 504 liability for them to which

they were not already subject.  While some courts have held that the state

effectively waived its sovereign immunity as of September 25, 2001, when

*Garcia* was decided, others have held that the waiver occurred as early as

February 25, 2001, when the Supreme Court decided *Garrett*.[14]  *See Doe*,

2004 WL 2829876, at *16 (noting split and collecting cases).  As can be

seen, the date on which the DOCS can be deemed to have had notice of

this change in the law is integral to the determination of whether

Shabazz's claims of official liability under the Rehabilitation Act survive,

---

[14]    One court has even suggested in dicta that arguably sovereign immunity
could have been waived as early as April 17, 2000, when the Supreme Court granted
*certiorari* in *Garrett*.  *Wasser v. New York State Office of Voc. & Educ. Servs. for
Indivs. with Disabilities*, No. 01-CV-6788, 2003 WL 22284576, at *10 (E.D.N.Y. Sept.
30, 2003).

given that in this case the events giving rise to plaintiff's claims allegedly span from January 31, 2001, the date of plaintiff's transfer from Mid-Orange to Mid-State Correctional Facility, until May 23, 2002, when plaintiff finally received a hinged knee brace.  Affording plaintiff the benefit of every inference, as I must on a motion for summary judgment, I therefore cannot conclude that plaintiff's Rehabilitation Act claims against defendants in their official capacities are precluded as a matter of law on the basis of sovereign immunity.

iii.   Merits

In addition to arguing that plaintiff may not sue them in their official capacities under Title II of the ADA or section 504 of the Rehabilitation Act, defendants contend that his claims under those provisions lack merit. In an official capacity action, a governmental entity is liable only when the entity itself is the "moving force" behind the deprivation.  *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105 (1985) (citations and internal quotations omitted).  In other words, the "entity's policy or custom must have played a part in the violation of federal law" for liability to attach.  *Id.* (citations and internal quotations omitted); *see also Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361-62 (1991) (citing *Graham*).

27

In this instance, by contrast, plaintiff's ADA and Rehabilitation Act claims are not a distinct effort by Shabazz to recover for an overarching policy of discrimination by the DOCS in its services or programming, as was intended by Congress in enacting those laws.  Instead, plaintiff's ADA and Rehabilitation Act claims represent no more than his effort to recast an Eighth Amendment claim for the deliberate indifference he alleges defendants showed to his individual medical needs.  As such, plaintiff's claims under the ADA and Rehabilitation Act necessarily fail on their merits, and I recommend that plaintiff's claims against the defendants in their official capacities under Title II of the ADA and section 504 of the Rehabilitation Act, to the extent those claims exist, be dismissed.  *See*, *e.g.*, *Ruocco v. Tung*, No. 302CV1443, 2004 WL 721716, at *6 (D. Conn. Mar. 30, 2004) (holding that the plaintiff's allegation that his orthopedic footwear was confiscated when he was transferred to another facility did not state a claim under the ADA based both on his failure to identify a program or service which he was denied and his failure to show discriminatory animus or ill will against him due to his disability).

In sum, I recommend dismissal of those portions of plaintiff's first, third and fifth causes of action, which attempt to state ADA and

Rehabilitation Act claims against the defendants, in both their individual and official capacities as a matter of law.

### D.    Due Process Claims

_____Plaintiff's second, fourth and six causes of action assert procedural due process violations, alleging that plaintiff's property, in the form of his knee brace, was confiscated without a hearing.  Defendants seek dismissal of this claim, arguing both that it should be considered as subsumed within the Eighth Amendment violation alleged, and additionally on the basis of lack of personal involvement.

### 1.    Merits

It is true, as defendants argue, that in certain circumstances where due process and medical indifference claims are closely intertwined and arise from a common set of circumstances, a procedural due process claim is considered to have been "subsumed" within the Eighth Amendment claim.  *See*, *e.g.*, *Estelle*, 429 U.S. at 101, 97 S. Ct. at 290. In this case, however, the due process and Eighth Amendment violations alleged are sufficiently distinct.  Plaintiff's procedural due process violation stems from the alleged confiscation of his knee brace at the time of his transfer into the Mid-State Correctional Facility.  Plaintiff's medical

indifference claims, on the other hand, challenge defendants' failure over the next seventeen months to provide him with a replacement brace.  On this basis, I recommend against a finding that the due process violation should be considered as indistinguishable from the Eighth Amendment claims being asserted by the plaintiff.

2.   Personal Involvement

Personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award of damages under section 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor – there is no *respondeat superior* liability under section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.  A supervisory official can, however, be

liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501; *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).

Both plaintiff's allegations against the three defendants named in his complaint and the record now before the court are completely devoid of any tangible connection between the defendants' actions and plaintiff's alleged injuries, a fact which proves fatal to his claims against them.  *See*, *e.g.*, *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (same).  "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent

in a § 1983 claim." *Richardson*, 347 F.3d at 435 (citations omitted).

Moreover, the defendants have affirmatively asserted that none of them

was personally responsible for or involved in the alleged confiscation of

plaintiff's knee brace upon his arrival at Mid-State, and indeed it is

doubtful that such a brace was ever ordered and supplied to the plaintiff

prior to his transfer into Mid-State.  Costello Decl. (Dkt. No. 21) ¶ 30;

Ramineni Decl. (Dkt. No. 21) ¶ 9; Baxter Decl. (Dkt. No. 21) ¶ 13.

Since defendants have challenged the question of their personal

involvement, and plaintiff has failed to come forward with evidence from

which a reasonable factfinder could determine their involvement in the

due process violation alleged, I recommend that this portion of

defendants' motion be granted and plaintiff's procedural due process

claims be dismissed as a matter of law based upon defendants' lack of

personal involvement.[15]

IV.   <u>SUMMARY AND RECOMMENDATION</u>

_____Having reviewed defendants' summary judgment motion, which is

---

[15]      In making this recommendation I do not address the legal sufficiency of
plaintiff's procedural due process claims.  I note, however, that New York provides an
adequate post-deprivation remedy in the Court of Claims with respect to property
claims by prison inmates, Court of Claims Act § 9 (McKinney 1989); the availability of
such remedies has been held by the United States Supreme Court to defeat due
process claims for loss of property.  See *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S.
Ct. 3194, 3203 (1984).

unopposed, for legal sufficiency, I recommend that it be granted and

plaintiff's complaint be dismissed in its entirety.  Plaintiff has failed to

offer any proof from which a reasonable factfinder could conclude that his

knee condition represented a serious medical need of constitutional

proportions.  Plaintiff's ADA and Rehabilitation Act claims against the

defendants in their official and individual capacities are barred as a matter

of law.  Plaintiff's procedural due process claims are subject to dismissal

based upon his failure to offer proof of the defendants' personal

involvement in the violations of which he now complains.[16]

Based upon the foregoing, it is hereby

RECOMMENDED that defendants' motion for summary judgment

(Dkt. No. 21) be GRANTED, and plaintiff's complaint be DISMISSED in its

entirety.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within

which to file written objections to the foregoing report.  Such objections

shall be filed with the Clerk of the Court.  FAILURE TO OBJECT TO THIS

REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.

---

[16]     In light of these determinations on the merits, I have not addressed defendants' additional claim that they are entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 121, S. Ct. 215, (2001).

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties by regular mail, and that plaintiff's copy be forwarded to his current address rather than that listed in his complaint.

David E. Peebles
U.S. Magistrate Judge

Dated:     May 9, 2005
            Syracuse, NY

G:\ISSUES\civil rights\ADA - Rehab Act\shabazz.wpd

34